IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KING RECORDS, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:03cv1130 |
| | ) |
| DONALD M. DAILY, et al., | ) Judge Thomas A. Wiseman, Jr. |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Before the Court is Plaintiffs' motion for summary judgment (Doc. No. 304). Specifically, Plaintiffs seek summary judgment on the following grounds:

(1) That Defendants have received "all associated rights and obligations" to which they are entitled in the George Jones Musicor master recordings that were to be transferred to Defendants pursuant to the August 30, 2003 letter agreement ("Settlement Agreement");

(2) That Defendants have received all the George Jones Musicor master recordings as well as all "DATs, multitrack and mixed-down tapes" that they are entitled to receive pursuant to the Settlement Agreement; and

(3) That the only sales by Plaintiffs of product manufactured from the George Jones Musicor master recordings after the expiration of the time period provided in the Settlement Agreement for Plaintiffs to sell off existing inventory were sales by Plaintiff International Marketing Group ("IMG") of 1,359 units to Music net, Inc.

(*See* Doc. No. 304, at 1–2.) Defendants oppose Plaintiffs' motion on the basis that material issues of disputed fact render summary judgment inappropriate.

For the reasons and on the grounds discussed in greater detail below, the Court finds that material issues of disputed fact preclude summary judgment on the issues of (1) whether Plaintiffs conveyed all the multitrack Musicor recordings in their possession that they were required to convey and (2) whether the recordings to which the parties refer as the "Mike Stone Tapes" are "mixed-down tapes" that Plaintiffs were required to convey to Defendants in accordance with the Settlement Agreement. Plaintiffs, however, are entitled to summary judgment in their favor on the remaining issues raised in their motion, including whether they breached the Settlement Agreement by failing to convey DATs; whether they breached the Settlement Agreement by failing to convey any recordings at all of twenty-eight songs that Defendants insist are George

Jones songs recorded for Musicor to which they are entitled; and whether Plaintiffs breached the Settlement Agreement by selling product manufactured from the George Jones Musicor recordings after the expiration of the sell-off period other than the 1,359 items Plaintiffs acknowledge were accidentally sold in violation of the Settlement Agreement.

**I.      STANDARD OF REVIEW**

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Willetts v. Ford Motor Co.*, 583 F.2d 852, 855 (6th Cir. 1978) (quoting Notes of Advisory Committee on 1963 Amendment to Rule 56, Fed. R. Civ. P.). However, the party opposing summary judgment must "set forth specific facts" demonstrating a genuine issue for trial—not mere beliefs. Thus, unsupported allegations that credibility is in issue will not suffice. *See, e.g.*, *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001) (noting that one party's unsupported assertions were not sufficient to undercut the credibility of uncontroverted affidavits); *In re Glazer*, 239 B.R. 352, 356 (N.D. Ohio 1999) ("[T]he non-movant may not simply attack the credibility of the movant's affiants without a supporting factual showing."). On the other hand, "if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." Notes of Advisory Committee on 1963 Amendment to Rule 56, Fed. R. Civ. P.

## II. DISCUSSION

### A. The Conveyance of All Intangible Rights and Obligations

At the time of the Settlement Agreement, Plaintiff King Records, now called Gusto (hereafter "King/Gusto") was the only plaintiff that owned intangible rights to the George Jones Musicor master recordings (hereafter, the "Musicor Masters") that were to be transferred pursuant to the Settlement Agreement. Defendants attempt to dispute this fact with a reference to a statement in David Showalter's declaration in which he states:

> At the time of the August 30, 2003 Settlement Agreement, the Daily parties owned a right to a producer's royalty. Due to the past conduct of surreptitiously transferring rights among related parties, the title of ownership *may have been held* by another entity which the King parties controlled, but *it is believed* that Moe Lytle and companies and persons he controlled and [sic] owned all other rights in and to the masters and indicia thereof, tangible and intangible. Further, Lytle had issued license to third parties who claimed a right to exploit the masters under limited conditions and terms. Lytle, his counsel and companies refused to transfer all license rights and income, claiming they were not included in the rights to be transferred. This was contrary to the terms and intent of the agreement. The Daily parties expended more than $20,000 in fees and costs and lost revenue forcing the Lytle parties to honor the agreement in this regard.

(Doc. No. 317, at ¶ 6 (emphasis added).) The Court finds that Mr. Showalter's statement does not create a genuine issue of disputed fact. Mr. Showalter speculates that title "may have been held" by some other entity but "it is believed" (Mr. Showalter does not indicate by whom) that Moe Lytle and other entities controlled by him owned all the rights to the Musicor Masters. This type of speculation is not sufficient to create a genuine dispute of fact. Moreover, the remainder of the paragraph has no relevance whatsoever to the matter before this Court, which is enforcement of the Settlement Agreement that was supposed to terminate this and all other litigation between and among the parties.

On the effective date of the Settlement Agreement, all intangible rights in the Musicor Masters that were required to be transferred pursuant to the Settlement Agreement were transferred to the Defendants. Defendants attempt to dispute this fact by referring to ancient history. Regardless of whether any of the Plaintiffs initially sought to dispute the fact that all intangible rights were transferred or whether the parties previously engaged in litigation to settle that issue, the Plaintiffs no longer dispute the fact so it is no longer

an issue, much to the Defendants' advantage.[1] The Court finds that Plaintiffs are entitled to summary judgment on the issue of whether they have complied with the Settlement Agreement by conveying all intangible rights and obligations associated with the Musicor Masters.

### B. The Conveyance of all DATs, Multitracks, "Mixed-Down Tapes" and Masters

The Settlement Agreement required King/Gusto to convey to Defendants all George Jones Musicor Masters, as well as all digital audio tapes ("DATs"), multitrack and "mixed-down" versions thereof that were owned by King/Gusto at the time of the Settlement Agreement. Specifically in that regard, the Settlement Agreement provides: "All George Jones Musicor master recordings and all associated rights and obligations, DATs, multitrack and mixed-down tapes *which King owns* . . .will be conveyed to [Defendants]." (Doc. No. 202, Ex. 1 (emphasis added).)

One legal dispute and four potential factual disputes arise in connection with this single provision of the Settlement Agreement. The legal dispute concerns the proper interpretation of the phrase "which King owns."

#### *(1) The Legal Issue: Interpretation of the Settlement Agreement*

A contract is to be interpreted according to its plain terms as written. *Warren v. Metro. Gov't of Nashville & Davidson County*, 955 S.W.2d 618, 622–23 (Tenn. Ct. App. 1997). The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect. *Davidson v. Davidson*, 916 S.W.2d 918, 922–23 (Tenn. Ct. App. 1995). The entire written agreement must be considered to ascertain the parties' intent. *D & E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518–19 (Tenn. 2001). The intent of the parties is derived from the four corners of the agreement, giving effect to all parts of the agreement. *Gale Smith & Co. v. Governor's Club, LLC*, No. M2001-01616-COA-R3-CV, 2002 WL 31094849, at *4 (Tenn. Ct. App. Sept. 20, 2002) (quoting *Blue Diamond Coal v. Holland-Am. Ins. Co.*, 671 S.W.2d 829, 833 (Tenn. 1984)). If the agreement is ambiguous, however, " 'the intent of the parties may be derived from extrinsic evidence.' " *Id.* (quoting *Blue Diamond Coal*, 671 S.W.2d at 833). A contract is considered ambiguous if, after considering its plain terms as a whole, it is

---

[1] It is beyond the Court's comprehension why the Defendants would attempt to relitigate this fact that has clearly been resolved in their favor.

susceptible of more than one meaning. *McGee v. Best*, 106 S.W.3d 48, 62–63 (Tenn. Ct. App. 2002).

The issue that has arisen here is whether the phrase "which King owns" is reasonably susceptible of more than one meaning. Defendants contend that the phrase should be understood as an affirmation or assertion that King owned all of the Musicor Masters and all DATs, multitrack and mixed-down versions thereof, and that it would convey same to the Defendants. Plaintiffs, on the other hand, contend that the phrase simply required them to convey all of the Musicor Masters and the referenced copies of them that they owned as of the date of the Settlement Agreement.

The Court does not view the specific phrase at issue as ambiguous or susceptible of more than one interpretation, such that it would be appropriate to consider extrinsic evidence to explain the agreement or the parties' intentions. The provision means what it says: King would convey all the Musicor Masters and the other recordings enumerated in the Settlement Agreement in its possession. The provision simply cannot reasonably be interpreted as both an affirmation that King/Gusto owned all existing Musicor Masters and all existing copies, and an assertion that it would convey them all. At a minimum, additional commas would be required to convey such a meaning. For instance, Defendants' proposed interpretation might be appropriate if the phrase "which King owns" were set apart with commas as follows: "All George Jones Musicor master recordings and all associated rights and obligations, DATs, multitrack and mixed down tapes[,] which King owns[,] . . . will be conveyed [to Defendants]." The bracketed commas are not present in the original, so the phrase must be understood to mean that King would convey all the referenced items that were in its possession as of the date of the Agreement.

Nothing in the remainder of the Settlement Agreement or its contexts requires or suggests that an alternative interpretation would be appropriate. Thus, to the extent Defendants' arguments in opposing summary judgment are based on its contention that the Agreement should be understood to include an affirmation by King/Gusto that it owned and was in possession of all Musicor Masters, DATs, multitracks and mixed-down version, as discussed below, such arguments fail as a matter of law.

Notwithstanding, there apparently still exists a factual dispute, or a potential factual dispute, as to what exactly King/Gusto possessed as of the date of the Settlement Agreement. The four potential factual disputes that have arisen in regard to this single provision of the Settlement Agreement are: (1) whether King/Gusto

breached the Settlement Agreement by failing to deliver any DATs along with the other items conveyed; (2) whether multitrack versions of some of the songs exist that King/Gusto failed to convey to Defendants (in addition to the mono- or two-track versions that were conveyed); (3) whether the "Mike Stone Tapes" are "mixed-down tapes" that King/Gusto was required to convey to the Defendants; and (4) whether additional original Musicor Masters exist that should have been but were not delivered to the Defendants along with the other recordings. Each of these four issues is addressed separately below.

### *(2)   The Potential Factual Disputes*

#### (a)   The DAT Issue

There is no dispute that King/Gusto did not turn over any DATs along with the other recordings delivered to Plaintiffs. Plaintiffs contend they had no obligation to do so because none were actually in existence at the time they entered into the Settlement Agreement. In that regard, Plaintiffs submit the declaration of Moe Lytle in which he stated that DATs are two-track digital audio tapes that were used in the 1990s but fell out of favor because of, among other problems, their tendency to rust. When they were in use, DATs were simply copies of two-track or mono mixed-down tapes. According to Mr. Lytle, Gusto/King did not possess any DATs of the Musicor Masters as of the date of the Settlement Agreement and therefore, pursuant to the terms of the Settlement Agreement, was not required to convey any to Defendants. Plaintiff Stephen Hawkins likewise testified in his declaration that at the time of the August 2003 Settlement Agreement, DATs were no longer in use and Gusto/King owned no DATs of the Musicor Masters when the Settlement Agreement was executed in August 2003. (Doc. No. 311, at ¶ 15.)

In response, other than protesting that the Settlement Agreement said DATs were to be conveyed and therefore should have been conveyed, Defendants have not produced any evidence to contradict Plaintiffs' evidence on this subject. For instance, Defendants have not presented evidence suggesting that DATs of the Musicor Masters were still in use or should have still been in existence as of August 2003 or that the DATs had any value independent of that of the Musicor Masters, multitracks, and mixed-down tapes that Defendants did receive. As indicated above, the Court has determined that if no DATs were in existence at the time of the Settlement Agreement, then Plaintiffs did not have an obligation under the Settlement Agreement to deliver any DATs.

Defendants' alternative position appears to be that they simply do not believe the testimony of Stephen Hawkins and Moe Lytle when they state that no DATs of the Musicor Masters were in their possession as of the date of the Settlement Agreement. Notwithstanding, Defendants cannot "simply attack the credibility of the [Plaintiffs'] affiants without a supporting factual showing." *In re Glazer*, 239 B.R. at 356. The Court therefore finds that there is no genuine issue of material fact as to whether the DATs should have been turned over along with the other tapes.

Plaintiffs are therefore entitled to summary judgment on the issue of whether they should have but failed to convey DATs to Defendants along with the other Musicor materials.

### (b) The Multitrack Issue

Defendants contend that all of the George Jones Musicor songs to which they are entitled were originally created on multitrack tapes (apparently meaning three or more tracks per song), but they received only mono-tape or two-track versions of some of the songs. On that basis, Defendants claim that King/Gusto breached the Settlement Agreement by failing to deliver multitrack versions of each of the Musicor Masters that were to be conveyed.

#### (i) Plaintiffs' Argument

Plaintiffs assert that they are entitled to summary judgment on this issue. They insist that plaintiff Stephen Hawkins made a diligent search of King/Gusto's premises and that Plaintiffs delivered to Defendants all versions of the Musicor Masters found in King/Gusto's possession that were located as a result of Mr. Hawkins' search. Specifically, Mr. Hawkins testified in the form of a declaration that he, in his capacity as officer of King/Gusto, assumed primary responsibility for delivery of the Musicor recordings to be delivered to Defendants pursuant to the Settlement Agreement. (Doc. No. 311, at ¶ 3.) According to Mr. Hawkins, all Musicor recordings, including 2500 recordings of 234 different songs were transferred to Defendants, with the exception of some two-track recordings that were tendered to Defendants but which Defendants refused.

Mr. Hawkins further testified that, to assemble the Musicor recordings for delivery to Defendants, he "used the document known as the 'CSP List' as a guide to determine which tapes of the songs on the Musicor List could be in the possession of Gusto/King. The CSP List was compiled to be a complete listing of all recording tapes acquired by CSP from Springboard International ('Springboard') (including the George Jones

Musicor recordings), which were part of the Musicor Catalog acquired by Springboard from Musicor Records and ultimately transferred to GMS and then to Gusto/King." (Doc. No. 311, at ¶ 8.) According to Mr. Hawkins, "[i]f a song title does not appear on the CSP List, it would mean that Gusto/King could not have acquired a tape of that song as part of its acquisition of the Musicor Catalog." (Doc. No. 311, at ¶ 9.) Mr. Hawkins further testified that:

> [t]he CSP List is not perfect. It was created by using the information on the tape boxes (not from listening to the tapes) and not all the information on the tape boxes was entered on the CSP List. Thus, for example, if an album by a lead artist contained songs by other artists, all of the songs were at times listed as performances by the lead artist without identifying the other artists. This happened with albums by George Jones so that, for example, there are songs on the CSP list identified as being performances of George Jones when in fact they are solo performances by Melba Montgomery on a George Jones album.

(Doc. No. 311, at ¶ 10.)

Mr. Hawkins states that by using the CSP List as a guide, he was able to determine the tape box number for each Musicor tape that might be in King/Gusto's possession. He then diligently searched the premises and the records of King/Gusto for all versions of the Musicor tapes in King/Gusto's possession. All Musicor tapes that he thus located were then delivered to Defendants. (Doc. No. 311, at ¶ 11.) He continued his search even after the November 1, 2004 delivery date, and subsequently located an additional Musicor tape containing seven duets in multitrack format by George Jones and Melba Montgomery, as well as additional two-track versions of songs that had already been delivered in other formats. These two-track tapes were tendered to Defendants, who refused to accept them. (Doc. No. 311, at ¶¶ 12, 13.)

Mr. Hawkins also addressed the fact that the notes taken by Mike Stone during the process of creating the Mike Stone Tapes (discussed below) indicate that Mr. Stone worked with certain multitrack versions of George Jones Musicor recordings that Plaintiffs have not been able to locate. According to Mr. Hawkins, regardless of whether Mr. Stone did in fact work with those multitracks or whether he erroneously noted their existence in the 1990s, they were not in the possession of King/Gusto or any of the other Plaintiffs as of November 1, 2004 and are not presently in the Plaintiffs' possession. (Doc. No. 311, at ¶ 14.)

Thus, regardless of whether other versions previously existed, Plaintiffs maintain that King/Gusto had no obligation under the Settlement Agreement to convey recordings that were not in its possession at the time of the Settlement Agreement, and further point out that the Settlement Agreement itself does not make any

distinction between the different physical types of tapes to be conveyed (DATs, multitrack, mixed-down), nor provide that a certain type (or types) of tape would be delivered for each of the Musicor songs. Plaintiffs point out that Defendant Harold Daily admitted in his deposition that no one made any representations to him prior to execution of the Settlement Agreement regarding what format the Musicor recordings would be in or whether multitrack versions of each of the songs existed or would be conveyed. Based on all of these factors, Plaintiffs contend that there are no genuine issues of material fact and they are entitled to summary judgment on the issue of whether they should have but failed to deliver a multitrack version of every single George Jones Musicor song.

        *(ii)      Defendants' Response*

In response to Plaintiffs' motion, Defendants rely on the Declarations of Harold Daily and David Showalter, and numerous exhibits attached to Mr. Showalter's Declaration, including Exhibit H, which purports to be a summary of other evidence presented in this case.

Harold Daily, in his Declaration, asserted that, "[w]hile some [of the George Jones Musicor] songs were recorded in mono-track format[,] they were also recorded, often on the same day, in multi-track format." (Doc. No. 327 (Decl. of Harold Daily), at ¶ 3.) Mr. Daily further declared that, "[b]ecause of the timeframe and where they were recorded, I know that all of the Jones Musicor masters were recorded in multitrack." (Doc. No. 327, at ¶ 3.) Mr. Daily, however, was not present at any of the recording sessions, and his purported "knowledge" of the events is based upon his knowledge of the general practice at the time and not the specific practice implemented during each George Jones Musicor recording session. In other words, it is apparent that Mr. Daily does not have personal knowledge regarding in what format each of the individual Musicor songs was recorded. Nor does Mr. Daily purport to have researched the issue and found documentary evidence to support his contention that each of the George Jones Musicor recordings was recorded in multitrack format. The Court therefore finds that Mr. Daily has not established a legitimate foundation for his statement, and that his testimony amounts to nothing more than speculation. Conclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992).

Second, although Plaintiffs contend that Defendants have not yet pointed to any specific song they

contend was recorded in multitrack and should have been but was not delivered to them, Defendants present Exhibit H (along with other potentially relevant exhibits). Exhibit H lists approximately seventeen songs that Defendants contend were recorded in multitrack, that were in King/Gusto's possession in the recent past, but for which no multitrack recording was conveyed.[2] Plaintiffs have asserted either that these songs were never recorded in multitrack or that the multitrack recordings once existed but have not been located in King/Gusto's possession despite diligent attempts to locate them. In addition, in a few instances, Plaintiffs contend they actually have already conveyed to Defendants a multitrack version of the song in question.

The documentary evidence to which Defendants point in support of their contention that King/Gusto should be and might still be in possession of additional multitrack recordings consists of (1) Mike Stone's notes, which supposedly indicate that he worked with multitrack versions of many of these songs in the 1990s or (2) copies of old tape boxes that suggest the particular songs were recorded in multitrack format.[3]

---

[2] Defendants' expert, Marshal Morgan, has purportedly identified several additional songs for which no multitracks were conveyed to Defendants, but Defendants have not presented an analysis regarding the existence of multitrack versions of those songs.

[3] Defendants attempt to create a major controversy involving the Plaintiffs' failure to turn over some of the original tape boxes when they transferred the tapes themselves. Defendants have not presented any actual evidence, as opposed to unsupported speculation, that Plaintiffs had an evil motive or anything to gain by withholding and destroying some of the tape boxes. In a Supplemental Declaration by Stephen Hawkins dated November 30, 2006, Mr. Hawkins testified that "the vast majority of tapes that were handed over were in the original tape boxes." (Doc. No. 341, at ¶ 3.) He further stated that in some instances it was necessary to remove some songs from tapes because those particular songs were not George Jones Musicor recordings that Plaintiffs were required to convey. In those instances, the splicing process "created tapes with different song configurations which were then placed in new tape boxes. Each of the songs contained on the tape in the new tape boxes were listed on the cover of the [new] tape box. The old boxes were discarded because they were no longer of any use." (*Id.*) In other instances, according to Mr. Hawkins, the original tape boxes were damaged so the tapes were placed in new tape boxes that were, once again, properly labeled with their contents.

Regardless of whatever motive Plaintiffs had in replacing some of the tape boxes, Defendants have not demonstrated that they were necessarily entitled to the original tape boxes nor that they were harmed by the failure to turn over the original tape boxes. Rather, Defendants seek to obtain discovery through the tape box labels, which is a completely different issue from whether Plaintiffs have complied with the terms of the Settlement Agreement. Defendants argue that they are prejudiced because they are not in possession of the original tape boxes or other documents that would allow them to identify specific versions of songs that were not delivered, but, as Plaintiffs point out, Defendants were allowed full access to Plaintiffs' documents for three and a half days but still have not identified any documents that support their claims on this issue. Moreover, Mr. Daily himself has admitted that the tape boxes "sometimes reflect the name of the label for which the music was recorded, but not always (Doc. No. 327, at ¶ 7), and he cannot confirm that the information recorded on tape boxes is always accurate or complete. (*See id.* (acknowledging that the date of recording is "likely" to be recorded on the tape box, and other information "likely" to be shown includes the

*(iii)    Analysis of Evidence*

As indicated above, the Court has determined that King/Gusto is only obligated to turn over those items it actually possessed as of the date of the Settlement Agreement. Notwithstanding, Defendants' position with regard to the so-called "missing multitracks" consists of a challenge to the credibility of Moe Lytle and Stephen Hawkins who have testified in their declarations that they have conducted a search and conveyed every item they are required by the Settlement Agreement to convey. A challenge to a declarant's credibility is not sufficient to defeat summary judgment unless specific facts are presented to justify such a challenge. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001) (noting that one party's *unsupported* assertions were not sufficient to undercut the credibility of uncontroverted affidavits). However, "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Willetts v. Ford Motor Co.*, 583 F.2d 852, 855 (6th Cir. 1978) (quoting Notes of Advisory Committee on 1963 Amendment to Rule 56, Fed. R. Civ. P.).

Here, Defendants have presented documentary evidence demonstrating that King/Gusto did have in its possession, relatively recently, multitrack recordings of certain songs for which only mono- or two-track versions were delivered to Defendants. Further, they have presented evidence that multitrack versions were created for at least some of the songs with respect to which Stephen Hawkins asserts no multitrack was ever created. King/Gusto has not offered any explanation for these discrepancies nor for how the items once in its possession, and which Plaintiffs apparently had good reason to believe were still in King/Gusto's possession at the time of the Settlement Agreement, were lost or transferred prior to execution of the Settlement Agreement. The Court concludes that the evidence presented by Defendants is sufficient, just barely, to require denial of summary judgment on the issue of whether King/Gusto delivered to Plaintiffs all the multitrack George Jones Musicor recordings in its possession. The evidence is not mere speculation nor does it give rise only to metaphysical doubt. Rather, given the existence of the documentary evidence, a

---

song title, artist, studio name, number of tracks, tape width, and so forth).) In any event, the Court views the tape-box issue as nothing more than a red herring, and the evidence is clear that Plaintiffs are in possession of the vast majority of the original tape boxes or copies of the labels that were affixed to the original tape boxes.

reasonable jury could disbelieve, and disregard, the testimony of Moe Lytle and Stephen Hawkins that multitrack recordings were not made for certain songs or that such recordings, if they were made, are no longer in King/Gusto's possession. Summary judgment on that issue is therefore not warranted.

### *(c) The "Mike Stone Tapes"*

According to King/Gusto, in the early 1990s, Moe Lytle asked Tommy Hill, a well-known record producer and songwriter, to try to improve the sound quality of many of the master tapes owned by Gusto/King, including some of the Musicor Masters. Mike Stone is the engineer who worked on this project with Tommy Hill. The parties refer to the resulting recordings made by Tommy Hill and Mike Stone as the "Mike Stone Tapes."

King/Gusto has presented evidence that the Mike Stone Tapes were created by, and at the expense of, Gusto/King in the mid-1990s. King/Gusto characterizes the Mike Stone Tapes as newly created recordings resulting from the creative input of Tommy Hill and Mr. Stone, in which they attempted to create improved versions of some of the Musicor Masters. (Doc. No. 306, at 4 (citing Lytle Decl. (Doc. No. 308), at ¶ 24.) The essence of this argument is that the Mike Stone Tapes, as "new creations" by Gusto/King, are not merely "mixed-down" versions of the Musicor Masters. Specifically in that regard, Moe Lytle testified as follows in a declaration submitted in support of Plaintiffs' Motion for Summary Judgment:

> In a few instances, Tommy Hill copied Musicor Tapes (which contained a maximum of 8 tracks) to 24-track tape to add additional instrumental and/or vocal tracks. The recordings by Tommy Hill were the result of his creative input containing his sound concepts and ideas. The 24-track tape was then transferred to a 2-track version that could be used to manufacture sound recordings (for example, cassettes and compact discs). In other instances, Tommy Hill worked with the 2-track Musicor Tapes to create new 2-track tapes with a different sound.

(Doc. No. 308, at ¶ 24.) King/Gusto therefore argues that the reference to "mixed-down tapes" in the Settlement Agreement does not cover the Mike Stone Tapes. Further, King/Gusto points out that Defendants knew about the existence of the Mike Stone Tapes prior to entering into the Settlement Agreement, but the Agreement does not expressly refer to them. According to this argument, because the Agreement does not expressly include them, they are not included, and King/Gusto has no obligation under the Agreement to convey the Tapes to Defendants.

In response, Defendants' position is simply that the Mike Stone Tapes are "mixed-down tapes" to

which they are entitled under the provision of the Settlement Agreement that required the Plaintiffs to turn over, in conjunction with the Musicor Masters "all associated rights and obligations, DATs, multitrack *and mixed-down tapes which King owns.*" (Doc. No. 202, Ex. 1 (emphasis added).) Defendants' argument that the Mike Stone Tapes are, in fact, "mixed-down" versions of the Musicor Masters is based upon Mike Stone's deposition testimony in which Mr. Stone repeatedly agreed to the characterization of the Tapes as "George Jones Musicor master mix-downs." (Doc. No. 326, at 5, citing Mike Stone Dep. at 14–15, 38–40, 61–65, 74–76, 82, 181–83.) Mr. Stone's testimony also suggests that the purpose of the project was to improve or enhance the sound quality of the Musicor Masters by re-equalizing them, rather than to create a truly "different sound," contrary to Mr. Lytle's statements:

> Q: In the work you did on the George Jones Musicor masters you make a statement in your Declaration, my work in remixing the master recordings was simply to attain better equalization. Is that –
>
> A: Yes.
>
> Q: your understanding of the work?
>
> A: Yes.
>
> Q: And – so, basically, you were working with the same Musicor sounds, just different levels of equalization on those sounds, correct?
>
> A: Well, yes, equalization, balance of the tracks, voices –
>
> Q: Balance of the sounds?
>
> A: Yes.

(Ex. F, Stone Dep., at 182.) In addition, Defendants agree that they were aware of the Mike Stone Tapes at the time of the Settlement Agreement, but claim they did not know whether there were any *other* mixed-down versions of the Musicor Masters. According to Defendants, "[i]t was the parties' intent to include all mixed-downs of Musicor masters in the Settlement Agreement, regardless of who worked on the mixed-down versions." (Doc. No. 326, at 7.) Thus, they argue, the fact that the Mike Stone Tapes were not specifically referenced in the Settlement Agreement does not mean they were not covered by the terms of the Agreement. Rather, the Settlement Agreement contains no limitations as to which mixed-down recordings should be included—all mixed-downs were to be included, including but not necessarily limited to the Mike Stone Tapes.

The Court agrees that Plaintiffs are not entitled to summary judgment on the issue of whether King/Gusto was required to turn over the Mike Stone Tapes to Defendants. When asked to define "mix-down," Mike Stone stated:

> Mix-down is simply taking any source from a tape machine . . . and going through some type of mixing console . . . and re-enhancing the master by either equalization or trying to place the audio farther spread spectrum [sic] across the speakers, or just making a straight copy. It depends on what . . . the client wants to do with it.

(Stone Dep. at 15:6--14.) In addition, Mr. Stone repeatedly acknowledged that the tapes he made constituted mixed-down tapes of the original Musicor Masters. (*See, e.g.*, Stone Dep. at 15:20—24 ("Q: As a result of your remixing process of the George Jones Musicor masters, the result of the mixing process would be a two-track mix-down master recording, correct? A: Correct.") While King/Gusto argues that the Mike Stone Tapes were not merely mixed-down versions of the Musicor Masters, it has not offered an alternative definition of "mixed-down." Moreover, while King argues that the Mike Stone Tapes resulted in additional tracks, Mr. Stone testified that no such additional tracks were added; rather the multitrack original recordings were reduced to two tracks. Finally, while King/Gusto emphasizes the fact that the Tapes were specially commissioned and paid for by Moe Lytle, they do not indicate why the Settlement Agreement should be interpreted to exclude "mixed-down tapes" made at Moe Lytle's request. Nor does the Settlement Agreement specifically require that the "mixed-down" tapes have been created at or around the same time as the original Musicor recordings. Further, the context in which the term "mixed-down" is used suggests that such a limited understanding is not appropriate, given that DATs (which Moe Lytle testifies were made in the 1990s and consisted of copies of the various "mixed-down" tapes) were also referenced in the same sentence of the Agreement, and they obviously were not made as part of the original recording process either. The only restrictions contained in the Agreement regarding mixed-down recordings was that they be made from the George Jones Musicor master recordings and that they be owned by King Records at the time of the Settlement Agreement. There is substantial evidence in the record indicating the Mike Stone Tapes are mixed-down tapes that fit those requirements.

Under the circumstances, a material factual dispute exists as to whether the Mike Stone Tapes are "mixed-down tapes" that should have been conveyed to Defendants under the Settlement Agreement.

Consequently, Plaintiffs' motion for summary judgment on that issue must be denied.

### (d) The Missing Masters Issue

Defendants maintain that there are twenty-eight songs by George Jones that were recorded under the Musicor label but for which no Master recordings (and no copies of the Masters) were delivered along with the other recordings, and that Plaintiffs breached the Settlement Agreement by failing to deliver the Musicor Master recordings of these twenty-eight songs.

Plaintiffs insist that they are entitled to summary judgment on this issue as well, based upon Mr. Hawkins' research and his testimony regarding the outcome of his search for the Musicor Masters. Specifically, Mr. Hawkins testified as follows:

> None of the 28 Songs are Musicor Tapes. Six of the 28 Songs are George Jones/Gene Pitney duets [that Plaintiffs were allowed under the Settlement Agreement to retain]; two of the 28 Songs are [Gene Pitney] solo recordings; three of the 28 Songs are Melba Montgomery solo recordings; one of the 28 Songs is an instrumental recording by a group known as "The Jones Boys" and contains no vocal performance by George Jones or any other performer; and the remaining 16 of the 28 Songs are not songs recorded by George Jones for Musicor but, instead, are songs recorded by George Jones for other record labels or companies.

(Doc. No. 311, at ¶ 3(b); *see also* Doc. No. 311, Ex. B (list of 28 Songs).) Mr. Hawkins stated in his declaration that he actually listened to all of the songs to verify whether they were in fact Jones/Pitney duets, Gene Pitney or Melba Montgomery solo recordings, or instrumental only. He also attached copies of album covers that corroborate his testimony in that they show the songs were released as such. (Doc. No. 311, at ¶¶ 18–21 and Exs. C–F.)

Further, with respect to the sixteen songs Mr. Hawkins testified were not recorded for Musicor, the primary basis for Mr. Hawkins' assertion in that regard is that these particular songs do not appear on the CSP List. "Accordingly, the 16 Songs are not Musicor Tapes, of which Gusto/King acquired ownership by its purchase of the Springboard Catalog." (Doc. No. 311, at ¶ 23.) Mr. Hawkins further testified as follows:

> 23. Although none of the 16 Songs appear on the CSP List, 9 of the 16 songs ("Heartaches By the Number"; "I Love You Because"; "If You Got the Money"; "I'll Be There"; "I'll Walk the Line"; "It's Been So Long"; "Just One More"; "Life To Go"; and "Old Lonesome Me") appear on the Mercury album titled "Country And Western Hits", as set forth on the copy of the album cover attached [to declaration] as Exhibit "G". The nine songs do appear on a copy of a tape box produced by Defendants in the Daily 1 litigation (attached [to declaration] as Exhibit "H"), but there is no indication on that tape box as to the record company, if any, for which these songs were recorded. . . .

>   24.  Five of the 16 Songs ("Gold and Silver"; "Holiday For Love"; "I'm Gonna Change Everything"; "Least Of All"; "Love's Gonna Live Here") were recorded by George Jones for United Artists, as indicated on the copy of the album cover for the United Artists album titled "I Get Lonely In A Hurry", attached [to declaration] as Exhibit "I"). Plaintiffs produced a copy of the tape box containing the tapes of these songs in the Daily 1 litigation and that tape box lists all five songs as "United Artists Rec. at Bradley Studios A Division of Columbia." (Exhibit I.)
>
>   25.  As to the remaining 2 songs of the 16 Songs ("No One Knows The Torture I've Been Through" and "The Lies You Told"), there is no available information to establish that they were recorded for Musicor Records. The two songs appear on a copy of a tape box produced by Defendants in the Daily 1 litigation . . . , but there is no indication on that tape box as to the record company, if any, for which those two songs were recorded.

(Doc. No. 311, at ¶¶ 23–25.)

In their response, Defendants argue that they are not in possession of all the documentation available to King/Gusto that would demonstrate that some of the songs that Plaintiffs insist were not recorded for Musicor were actually recorded for Musicor. Defendants contend, however, that they have some information in their possession that calls into question Mr. Hawkins' credibility. As one example, they point to a tape box copy Defendants contend supports their claim that the song "Gold and Silver" was, contrary to Mr. Hawkins' testimony, a Musicor recording. Contrary to Defendants' assertion, however, the document to which Defendants refer clearly states that "Gold and Silver" was recorded for "United Artists, a division of Columbia Records". (*See* Doc. No. 323-4 at 21 (bates-numbered King 950, APX 2206 and Exhibit D-79).) The same is true for the other four songs referenced in paragraph 24 of Mr. Hawkins' declaration. Defendants have not produced any evidence that refutes Mr. Hawkins' testimony or calls his credibility into question, or any evidence from which a jury could conclude that these particular songs were recorded for Musicor.

Similarly, Defendants' other example is the song "They Bought the House Next Door," which Defendants contend is a Melba Montgomery/George Jones duet which Plaintiffs are required by the Settlement Agreement to turn over. The tape box label to which Defendants refer in support of their contention clearly indicates that the song was recorded as a Melba Montgomery solo. In addition, as indicated above, Stephen Hawkins testified that he has listened to the song and that it is in fact a solo vocal recording by Melba Montgomery; he also produced the album cover to show the song was released as a Melba Montgomery solo. Again, Defendants' "evidence" does not create a material issue of disputed fact on the question of whether Plaintiffs wrongfully failed to turn over this particular song.

The only other "evidence" to which Defendants point is that when Plaintiffs first delivered the recordings to Defendants pursuant to the Settlement Agreement, the list that Plaintiffs included with the tapes indicated that some of the songs they now contend were not recorded for Musicor were among those recordings being delivered. (*See* Doc. 323-4, listing songs purportedly conveyed to Defendants.) However, the referenced document expressly states that the list was based on information written on the tape boxes, which everyone agrees was not necessarily accurate, and at that point, "[i]n many cases the contents have not been verified as the tapes have not necessarily been listened to." (*Id.* at 1.) In other words, the fact that the song may have been included on a list compiled by Plaintiffs documenting what they believed they were delivering, based on information they later confirmed to be erroneous, is not actual evidence of whether the referenced song was a George Jones Musicor recording that they were required to convey to Defendants.

Basically, Defendants cannot refute Mr. Hawkins' testimony. They seek discovery in order to verify Hawkins' statements, but they have not offered one shred of admissible evidence to create a material issue of disputed fact regarding whether the "28 songs" might in fact have been recorded for Musicor, nor have they presented any evidence to refute or call into question the veracity of Stephen Hawkins' testimony. Again, Defendants cannot "simply attack the credibility of the [Plaintiffs'] affiants without a supporting factual showing." *In re Glazer*, 239 B.R. at 356. Mere speculation and wishful thinking are not sufficient to avoid summary judgment.

The Court finds that there are no material issues of disputed fact on the question of the "missing masters," and that the songs Defendants claim they were entitled to receive were not actually recorded by George Jones for Musicor and therefore are not covered by the Settlement Agreement. Plaintiffs are entitled to summary judgment in their favor on the issue of whether they breached the Agreement by failing to deliver Master recordings of the 28 songs.

### C. Sales of Product After Expiration of the Sell-Off Period

Plaintiffs concede that they mistakenly sold 1,359 pieces of product made from the George Jones Musicor recordings to Music Net, Inc. after the expiration of the sell-off period, and that the maximum retail value of the products sold was $6,673.08. Defendants steadfastly maintain that they are entitled to extensive discovery which, they contend, will establish that Plaintiffs sold many more units of offending product than that

and that Defendants consequently are entitled to a much more significant amount of damages. Defendants have not, however, proffered any coherent, admissible evidence to rebut or contest the evidence offered by Plaintiffs, nor have they presented their own statement of facts as to which there are material disputes. Despite Defendants' clamoring for additional discovery, they have taken numerous depositions and conducted their own independent investigation without coming up with any evidence to support their theory.

There are no material issues of disputed fact and Plaintiffs are entitled to summary judgment in their favor on the issue of post-sell-off-period sales.

### III. CONCLUSION

As set forth above, Plaintiffs are entitled to partial summary judgment in their favor on the remaining issues in this case. Material factual disputes exist concerning whether Defendants are entitled to the Mike Stone Tapes and regarding whether Plaintiffs should have but failed to convey multitrack versions of some of the George Jones Musicor songs. In all other respects, Plaintiffs' motion for summary judgment will be granted.

An appropriate Order will enter.

_(signature)_
Thomas A. Wiseman, Jr.
Senior U.S. District Judge